IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN T. WALKER          :          CIVIL ACTION
                                  :
     v.                   :
                                  :
COMMONWEALTH OF      :
PENNSYLVANIA            :          NO. 11-0300

ORDER

        AND NOW, this 12th day of August, 2015, upon consideration of petitioner Shawn T. Walker's counseled, amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (docket entry #27) and memorandum of law in support thereof, respondent Commonwealth of Pennsylvania's response thereto, our Order referring this matter to the Honorable Lynne A. Sitarski for a report and recommendation, Judge Sitarski's report and recommendation (docket entry #59), and petitioner Walker's counseled objections thereto, and the Court finding that:

        (a)     On February 20, 2015, Judge Sitarksi issued her report and recommendation that we deny Walker's petition for writ of habeas corpus;

        (b)     Local Rule 72.1 IV(b) provides that "[a]ny party may object to a magistrate judge's proposed findings, recommendations or report under 28 U.S.C. 636(b)(1)(B) … within fourteen days after being served with a copy thereof" by filing "written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections;"

        (c)     After several requests for additional time, which the Court granted, Walker filed his counseled objections on July 2, 2015;

(d)     As Walker does not object to the procedural history recounted in the report

and recommendation ("R&R"), we recite the history of this case as recounted therein;

(e)     On March 3, 1992, following a trial by jury in the Court of Common Pleas

of Philadelphia County, Walker was convicted of first degree murder, aggravated assault, simple

assault, recklessly endangering another person, criminal trespass, possession of an instrument of

crime, and carrying firearms in a public street or place, R&R at 3-4;[1]

(f)     After a sentencing hearing, the jury sentenced Walker to death, and the

trial court re-imposed the jury's death sentence on June 8, 1993, id. at 4;

---

[1] The report and recommendation included a recitation of the facts underlying Walker's
conviction from Commonwealth v. Walker, 656 A.2d 90, 94-95 (Pa. 1995) ("Walker I"). R&R at
1-3. We summarize those facts briefly.

For two years, Walker lived with Lisa Johnson, with whom he had two children. Walker
abused her. Johnson left him to escape the abuse, taking their sons to live with her parents, the
McKnights. Walker repeatedly harassed Johnson by going over to the McKnight residence to
threaten her. She obtained a protection from abuse order, but to no avail. Walker made repeated
threats to kill her and her family.

On April 22, 1991, Walker once again went to the McKnight residence and physically
assaulted Johnson. Later in the day, he repeatedly called the house, demanding to speak with
Johnson and asking whether her new boyfriend was there. Ricardo Thomas, the godfather of one
of Johnson's children, took one of these phone calls and ordered Walker to stop harassing
Johnson. Around midnight, Walker called again, told Johnson he was coming over, and
threatened her. Thomas agreed to sleep downstairs in case Walker followed through on his
threats. He slept on one couch while Johnson slept on the other.

At 3:00 a.m., after waiting around the block in his car, Walker broke in through the front
door, walked over to Thomas, and shot him in the chest and forehead while he slept. Forensic
evidence showed that the shots were fired from six to ten inches away. Walker then shot
Johnson, now awake, twice in the head. The McKnights heard gun shots, but thinking they came
from outside, returned to bed.

The next morning, they found Thomas dead on the sofa in the fetal position. Johnson,
alive, was rushed to the hospital. The front door lock was broken. The police interviewed the
McKnights and later discovered that Walker had admitted himself to a hospital. The police went
to the hospital, and upon his release, Walker voluntarily accompanied them to the police station,
where he was given Miranda warnings. Walker waived and confessed to the crime, but stated
that he had wrestled with Thomas before shooting him. Johnson regained consciousness three
days later and told her mother that Walker had shot her. As a result of her injuries, Johnson is
almost entirely confined to a wheelchair.

(g)     Walker appealed, but the Pennsylvania Supreme Court affirmed Walker's judgment of sentence on March 23, 1995, id.;

(h)     On May 16, 1996, Walker filed a pro se petition pursuant to Pennsylvania's Post Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. § 9541, id.;

(i)     On April 21, 2004 -- after the appointment of counsel, several delays, and multiple hearings -- the PCRA Court orally granted Walker a new penalty phase hearing but denied all other requested relief, id. at 5;

(j)     Walker appealed the PCRA Court's denial of guilt-phase relief, raising fourteen issues, the five relevant to his habeas petition being: (1) the prosecution and defense improperly presented evidence of Walker's prior convictions, incarceration, and other "bad acts" at trial, and appellate counsel was ineffective for not raising this issue; (2) the prosecutor withheld victim Ricardo Thomas' criminal record from the defense, (3) trial counsel was ineffective in his presentation of evidence and argument in support of Walker's testimony that the victim was shot during a struggle, and the prosecutor allowed and encouraged false and misleading testimony and made false and misleading arguments to the jury; (4) Walker's statement was taken after an unlawful arrest and its admission was improper; and (5) trial counsel failed to adequately develop the defenses of diminished capacity, imperfect self-defense, heat of passion, lack of intent to kill, and mental health-related defenses, id.;

(k)     The PCRA Court reviewed Walker's claims and affirmed both the dismissal of Walker's guilt phase claims and the grant of a new penalty phase hearing, id. at 6;

(l)     On May 20, 2004, Walker timely appealed to the Pennsylvania Supreme Court, id.;

(m)     While Walker's appeal was pending, Walker filed a <u>pro</u> <u>se</u> <u>habeas</u> <u>corpus</u> petition in the United States District Court for the Eastern District of Pennsylvania, and on November 28, 2011, then-Magistrate Judge L. Felipe Restrepo issued a report and recommendation that the petition be dismissed without prejudice because Walker's claims were unexhausted;

(n)     Two days later, on November 30, 2011, the Pennsylvania Supreme Court affirmed the PCRA Court, <u>Commonwealth v. Walker</u>, 36 A.3d 1, 17 (Pa. 2011) ("<u>Walker II</u>");

(o)     Since the intervening Pennsylvania Supreme Court decision exhausted Walker's claims, the district court placed Walker's <u>habeas</u> proceedings in civil suspense pending Walker's resentencing and any appeals arising therefrom, R&R at 7;

(p)     On April 12, 2012, Walker was re-sentenced to life imprisonment without parole, and shortly thereafter the district court granted Walker's motion to reinstate his <u>habeas</u> proceedings, <u>id.</u>;

(q)     On June 19, 2012, Walker filed a counseled, amended petition for writ of <u>habeas</u> <u>corpus</u>, raising two claims: (1) the Commonwealth violated Walker's Due Process rights when it "withheld the decedent's criminal record and took advantage of that suppression to make false and misleading assertions to the jury; in the alternative, counsel was ineffective;" and (2) "[c]ounsel was ineffective at trial, and the prosecution violated due process," <u>id.</u>;

(r)     After considering Walker's claims, Judge Sitarski concluded in her report and recommendation that neither claim had merit or required an evidentiary hearing and no certificate of appealability should issue, <u>id.</u> at 47;

4

(s)     Walker objected to certain portions of the report and recommendation, and we make de novo determinations of those portions of the report or specified proposed findings or recommendations, see 28 U.S.C. § 636;

(t)     We briefly rehearse the standards from the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") governing our de novo review;

(u)     AEDPA permits persons in state custody to file a petition seeking the writ of habeas corpus in federal court, 28 U.S.C. § 2254(a), but mandates great deference state courts' factual findings and legal determinations, see Woodford v. Viscotti, 537 U.S. 19, 24 (2002) (explaining Section 2254(d)'s highly deferential standard for evaluating state court rulings) & Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (explaining that AEDPA increased the deference federal courts must give to state courts' factual findings and legal determinations);

(v)     If a state court adjudicated a habeas petitioner's claims on the merits, then a federal court may not grant a relief on those claims unless (1) the state court's adjudication of the claim resulted in a decision contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or (2) the adjudication resulted in decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, 28 U.S.C. § 2254(d)(1)-(2);

(w)     A federal court evaluating a habeas petition may only grant the writ under 28 U.S.C. § 2254(d)(1) if the state court arrived at a conclusion opposite to that reached by the Supreme Court of the United States on a question of law or if the state court decided a case differently that the Supreme Court on a set of materially indistinguishable facts, Hameen v. State of Delaware, 212 F.3d 226, 235 (3d Cir. 2000) (citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000));

(x)     An unreasonable application inquiry requires us to ask whether the state court's application of clearly established law was objectively unreasonable, id., but an unreasonable application differs from an incorrect application, and we may not grant relief unless the state court's incorrect or erroneous application of clearly established law was also unreasonable, Werts, 228 F.3d at 196;

(y)     Under 28 U.S.C. § 2254(d)(2), we may not grant a state prisoner's application for habeas relief on a claim already adjudicated on its merits in state court unless the adjudication resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding;

(z)     Because we presume a state court's factual determinations to be correct absent clear and convincing evidence to the contrary, 28 U.S.C. § 2254(e)(1), an adjudication on the merits in state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, Miller-El v. Cockrell, 537 U.S. 322, 340 (2003);

(aa)    To show that a factual determination is objectively unreasonable, a petitioner must show that a reasonable fact-finder would necessarily have to conclude that the state court's determination of the facts was unreasonable, Rice v. Collins, 546 U.S. 333, 341 (2006), but a state court's factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance, Wood v. Allen, 558 U.S. 290, 301 (2010);

(bb)    Walker raises three specific objections to the report and recommendation, arguing that (1) the state court erred in its use or application of the "reasonable probability" standard with respect to his Brady claim, (2) the state court should have used a more "defendant-

6

friendly" standard when evaluating his claims, and (3) the state court's adjudication of his Due

Process claim involved an unreasonable application of clearly established federal precedent,

Objections at 8-9, 13, 14-15;

> (cc)    We consider these objections in turn;

> (dd)    First, Walker objects to the portion of the report and recommendation

concluding that the state court did not err in its use or application of the "reasonable probability"

standard with respect to Walker's <u>Brady</u> claim, <u>id.</u> at 8-9;

> (ee)    The report and recommendation found that the law the Pennsylvania

Supreme Court applied to evaluate Walker's <u>Brady</u> claim was not inconsistent with, or contrary

to, governing United States Supreme Court precedent, even though at one point in its decision

the Pennsylvania Supreme Court used the phrase "would have differed" instead of the specific

language from <u>Kyles</u> regarding the "reasonable probability" standard, R&R at 12-13;

> (ff)    We consider the Pennsylvania Supreme Court's opinion in

<u>Commonwealth v. Walker</u>, 36 A.3d 1 (Pa. 2011) ("<u>Walker II</u>"), the last state court decision in

Walker's post-conviction proceedings;

> (gg)    In <u>Walker II</u>, the Pennsylvania Supreme Court considered whether the

Commonwealth violated Walker's Due Process rights and <u>Brady v. Maryland</u>, 373 U.S. 83

(1963), by withholding Ricardo Thomas' criminal history from the defense and then making

false, misleading statements regarding the victim's good character, <u>Walker II</u>, 36 A.3d at 9;

> (hh)    To explain what Walker would have to show to demonstrate a <u>Brady</u>

violation, the Pennsylvania Supreme Court said:

>> Under <u>Brady</u>, a prosecutor has an obligation to disclose all
>> exculpatory information material to the guilt or punishment of an
>> accused, including evidence of an impeachment nature. To
>> establish a <u>Brady</u> violation, appellant must demonstrate: the

7

evidence at issue was favorable to him, because it was either exculpatory or could have been used for impeachment; the prosecution either willfully or inadvertently suppressed the evidence; and prejudice ensued. The evidence at issue must have been material evidence that deprived the defendant of a fair trial. <u>Favorable evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.</u>

<u>Id.</u> (internal citations, quotations, and ellipses omitted) (emphasis added);

(ii)   Applying this law, the Pennsylvania Supreme Court reasoned:

Viewing all of the evidence presented at trial, <u>we cannot conclude, even if appellant had the purported benefit of the victim's arrest record to support his self-defense claim and rebut the Commonwealth's alleged portrayal of the victim as a law-abiding citizen, the outcome of trial would have differed.</u> There was no question regarding the killer's identity, as appellant confessed to the crimes. There was evidence the front door's lock was broken, and that the victim was asleep at the time of the killing. No gun was found on or around the victim, and there was no evidence of a struggle. There was evidence appellant was lying in wait outside the home before he broke in, and he engaged in a pattern of harassment and threats against the victim. Thus, there was overwhelming evidence that the murder was deliberate and premeditated. <u>Appellant fails to show that, had the victim's arrest record been disclosed to him and admitted at trial, it would have cast enough doubt on the Commonwealth's case to have resulted in a different outcome in the guilt phase.</u> As appellant has failed to carry his burden of demonstrating he was prejudiced by the Commonwealth's actions, this claim fails, and remand for further development of it is unnecessary.

<u>Id.</u> at 10 (internal quotations and footnotes omitted) (emphasis added);

(jj)   The Supreme Court of the United States has explained that under <u>Brady</u> "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," <u>Kyles v. Whitley</u>, 514 U.S. 419, 433 (1995) (internal quotations and citations omitted);

8

(kk)     Rejecting other tests, the Supreme Court explained that the

touchstone of materiality is a reasonable probability of a different
result, and the adjective is important. The question is not whether
the defendant would more likely that not have received a different
verdict with the evidence, but whether in its absence he received a
fair trial, understood as a trial resulting in a verdict worthy of
confidence. A reasonable probability of a different result is
accordingly shown when the government's evidentiary suppression
undermines confidence in the outcome of the trial.

Id. at 434 (internal quotations and citations omitted);

(ll)     A state court decision is contrary to clearly established federal law if it is

"diametrically different," "opposite in nature," or "mutually opposed" to a holding from the

United States Supreme Court, Jamison v. Klem, 544 F.2d 266, 274 (3d Cir. 2008) (quoting

Williams, 529 U.S. at 406);

(mm)   This happens, in one instance, when the state court ignores or

misapprehends clear precedent, but importantly the "state court need not even be aware" of

Supreme Court precedent "so long as neither the reasoning nor the result of the state-court

decision contradicts them," id. at 274-75 (quoting Mitchell v. Esparza, 540 U.S. 12, 16 (2003)

(per curiam));

(nn)     We therefore look to what the Pennsylvania Supreme Court said and did in

its analysis in Walker II, not necessarily the cases it cited to, though we note that it quoted

extensively from Commonwealth v. Spotz, 18 A.3d 244 (Pa. 2011), which in turn quoted from

Kyles, see Walker II, 36 A.3d at 9 (citing Spotz for the Brady standard) & Spotz, 18 A.3d at 276

(quoting from Kyles for the Brady standard);

(oo)     The Pennsylvania Supreme Court, setting forth the standard for materiality

under Brady, correctly articulated that the standard is whether there is a reasonable probability

that the outcome of the proceeding would have been different, Walker II, 36 A.3d at 9;

9

(pp)     In its analysis of Walker's arguments, the Pennsylvania Supreme Court stated that the introduction of the evidence Walker alleged was suppressed would not "have resulted in a different outcome," id. at 10;

(qq)     While the Pennsylvania Supreme Court omitted the phrase "reasonable probability" from its analysis, that omission does not mean that its decision was diametrically different, opposite in nature, or mutually opposed to the rule set forth in Kyles;

(rr)     The substance of the Pennsylvania Supreme Court's analysis was that the Commonwealth marshalled extensive evidence that Walker killed the victim in his sleep, precluding the likely success of a self-defense claim, so it would not have mattered if Walker had been permitted to show at trial that his victim had an arrest record because that would not have changed the result;

(ss)     To comply exactly with the rule from Kyles, all the Pennsylvania Supreme Court would have had to say is that the Commonwealth marshalled extensive evidence that Walker killed the victim in his sleep, precluding the likely success of a self-defense claim, so it would not have mattered if Walker had been permitted to show at trial that his victim had an arrest record because there was no reasonable probability that it would have changed the result;

(tt)     But verbatim recitation is not required, and this minor deviation from the precise wording of the standard in its application does not suggest that the Pennsylvania Supreme Court applied the standard in a manner diametrically opposed to governing precedent, especially given that the Pennsylvania Supreme Court set out the appropriate standard verbatim just before applying it;

(uu)     As we conclude, based on our de novo review, that the Pennsylvania Supreme Court did not err in its use or application of the "reasonable probability" standard with

respect to Walker's <u>Brady</u> claim, we overrule Walker's objection to the report and recommendation on this point;

(vv)    Second, Walker objects to the portion of the report and recommendation rejecting his argument that the more "defendant-friendly" prejudice standard of "any reasonable likelihood that the false testimony could have affected the judgment of the jury" applies, Objections at 13;

(ww)   The report and recommendation found that the Pennsylvania Supreme Court's decision was not contrary to United States Supreme Court precedent because the more "defendant-friendly" standard that Walker believes the Pennsylvania Supreme Court should have used was inapplicable to his case, R&R at 14;

(xx)    In dicta to its decision in <u>Kyles</u>, the Supreme Court discussed the situation where a <u>Brady</u> claim might arise "where previously undisclosed evidence revealed that the prosecution introduced at trial testimony that it knew or should have known was perjured," <u>Kyles</u>, 514 U.S. at 433;

(yy)    In a footnote, the Supreme Court explained that "a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury," <u>id.</u> at 433 n.7 (citing <u>United States v. Agurs</u>, 427 U.S. 97, 102-03 (1976));

(zz)    This standard does not apply to Walker's case, as there is no allegation that the prosecution used perjured testimony to obtain Walker's conviction;

(aaa)   Further, even if Walker had alleged that the prosecution used perjured testimony to obtain his conviction, the correct standard would still have been the "reasonable probability" standard from <u>Kyles</u>, see, e.g., <u>Banks v. Dretke</u>, 540 U.S. 668, 694, 698 (using the

Kyles standard of "reasonable probability" for materiality where the prosecution elicited witness testimony it knew to be false and failed to correct the record);

(bbb)   As we conclude, based on our de novo review, that the Pennsylvania Supreme Court was not obligated to use the standard of "any reasonable likelihood that the false testimony could have affected the judgment of the jury," we overrule Walker's objection to the report and recommendation on this point;

(ccc)   Third, Walker objects to the portion of the report and recommendation concluding that the state court's adjudication of his Due Process claim did not involve an unreasonable application of clearly established federal precedent, Objections at 14-15;

(ddd)   The report and recommendation concluded that the Pennsylvania Supreme Court's adjudication of Walker's Brady claim was not objectively unreasonable because the state court reached the conclusion that the victim's suppressed criminal records were not material by comparing their probative value to the rest of the Commonwealth's case, R&R at 16;

(eee)   Walker argues that (1) the cases he cited to support his argument that he could have used the victim's criminal record to establish self-defense were on point, (2) Pennsylvania does not have a rule barring the admissibility of arrest records to show that a deceased victim was the initial aggressor, (3) Walker's possession of a loaded gun when he arrived at the house where the victim was sleeping does not defeat his self-defense claim, and (4) the victim's motive for sleeping at the house where he was killed is relevant to the reliability of the verdict, Objections at 15, 18, 19, 20;

(fff)   First, we consider whether Walker could have used Ricardo Thomas' criminal record to establish self-defense at trial;

(ggg)   In a homicide trial where the defendant asserts self-defense, he may introduce "evidence of the turbulent or dangerous character of the decedent," Commonwealth v. Dillon, 598 A.2d 963, 964 (Pa. 1991);

(hhh)   Such character evidence is admissible to (1) corroborate the defendant's alleged knowledge of the victim's violent character in an effort to show that the defendant reasonably believed that his life was in danger, or (2) to prove the victim's allegedly violent propensities to show that the victim was in fact the aggressor, id. at 964-65;

(iii)   Generally, character may be proven by reputation evidence only, but a victim's convictions and violent acts not resulting in a conviction, of which the defendant had knowledge, can be introduced to corroborate the defendant's alleged knowledge of the victim's violent character, i.e. for the first purpose described in Dillon, but violent acts not resulting in conviction may not be offered for the second purpose, i.e. to prove the victim's allegedly violent propensities, Commonwealth v. Smith, 416 A.2d 986, 988 (Pa. 1980);

(jjj)   In his counseled, amended petition, Walker does not argue or make factual proffer that he knew of Ricardo Thomas' violent character,[2] but rather argues that Thomas' criminal record supports Walker's testimony that Thomas was the initial aggressor, Am. Pet. at ¶ 34;

(kkk)   Walker explains, by reference to Thomas' criminal record, that Thomas was a fugitive on charges of aggravated assault, reckless endangerment, and terroristic threats in

---

[2] Walker argued in his counseled, amended petition that Thomas' criminal history undermined the prosecutor's arguments at trial that Walker made up the threats he said Thomas made on the telephone earlier in the day of the murder. Am. Pet. at ¶ 33. But Walker does not argue in his objections that these threats constituted knowledge of the victim's violent character demonstrating that he reasonably believed his life was in danger, nor would they.

Philadelphia and had additional charges for robbery, theft, receiving stolen property, and assault that had been dismissed for lack of witnesses, id. at ¶ 31;

(lll)    Walker elaborates that in July of 1990 Thomas attacked a man, threatened a police officer with an axe, had to be subdued by Philadelphia police officers, and possessed both a knife and a gun, id.;

(mmm)A review of Thomas' criminal record, Am. Pet. App'x at 1-40, shows that Ricardo Thomas had many arrests and a bench warrant -- but no criminal convictions -- when Walker shot and killed him;

(nnn)    As clearly stated in Smith, violent acts not resulting in a conviction may not be offered to prove the allegedly violent propensities of the victim to show that the victim was in fact the aggressor, Smith, 416 A.2d at 988;

(ooo)    Nonetheless, Walker argues that the cases of Commonwealth v. Harvey, 812 A.2d 1190 (Pa. 2002), abrogated on other grounds by Commonwealth v. Elliott, 80 A.3d 415 (Pa. 2013), Commonwealth v. Dillon, 598 A.2d 963 (Pa. 1991), Commonwealth v. Carbone, 707 A.2d 1145 (Pa. Super. Ct. 1998), Commonwealth v. Clemmons, 479 A.2d 955 (Pa. 1984), and Commonwealth v. Williams, 640 A.2d 1251 (Pa. 1994) support his argument that he would have been permitted to present evidence of violent acts that did not result in a conviction to show Thomas' dangerous character, Objections at 16;

(ppp)    But none of these cases disturb our conclusion, pursuant to the rules in Dillon and Smith, that Walker would not have been permitted to introduce evidence of Thomas' arrests at trial;

(qqq)    In Harvey, the defendant claimed that his trial counsel was ineffective for not introducing into evidence a gun and rounds of ammunition found in the victim's car because

14

this evidence would have supported defendant's claim that he had a reasonable belief he was in danger when he shot his victim, <u>Harvey</u>, 812 A.2d at 1198;

(rrr)   But the Pennsylvania Supreme Court reasoned that since the gun was in a car outside the house where the victim was killed, and not with the victim, the gun would only be relevant to the defendant's claim of self-defense if used to show the victim's violent propensities, <u>id.</u>;

(sss)   While <u>Harvey</u> can be read broadly to suggest that evidence of violent propensities is relevant to a defendant's self-defense claim in a homicide trial, the Pennsylvania Supreme Court, by the time <u>Harvey</u> was decided in 2002, had already decided in <u>Smith</u>, with greater specificity, that when the evidence is violent acts not resulting in a conviction -- such as arrests -- such evidence is not admissible to prove the victim's allegedly violent propensities to show that the victim was in fact the aggressor, <u>Smith</u>, 416 A.2d at 988;

(ttt)   In <u>Dillon</u>, the defendant sought to present eyewitness testimony from her son regarded her decedent-husband-victim's violent character while intoxicated to bolster her self-defense claim at trial, <u>Dillon</u>, 598 A.2d at 964-65;

(uuu)   Like <u>Harvey</u>, <u>Dillon</u> can be read very broadly to suggest that evidence of violent propensity is admissible to bolster a self-defense claim, but again, <u>Dillon</u> dealt with eyewitness testimony of bad acts and is therefore factually distinguishable from Walker's case, which falls squarely within the rule from <u>Smith</u>;

(vvv)   Similarly, <u>Carbone</u> dealt with eyewitness testimony, not an arrest record, see <u>Carbone</u>, 707 A.2d at 1154, and is therefore unhelpful to Walker's case for the same reasons <u>Dillon</u> is unhelpful;

(www) In Clemmons, the defendant argued that his counsel was ineffective for failing to introduce a coroner's report confirming the presence of alcohol in the deceased victim's system and describing the victim as having an aggressive personality type, but the Pennsylvania Supreme Court rejected that argument because there was no dispute at trial that the victim was the initial aggressor, Clemmons, 479 A.2d at 960-61;

(xxx)   In a footnote about the coroner's report, the Pennsylvania Supreme Court noted that "Although the evidence sought to be introduced in Amos…dealt with the victim's felony convictions, as opposed to a medical report here, the reasoning for introducing the evidence is still the same," id. at 961 n.3;

(yyy)   The "reasoning" referred to here is the general reasoning from Amos that evidence of a deceased victim's propensity for violence is admissible on the issue of whether or not the victim was the aggressor, see Commonwealth v. Amos, 284 A.2d 748, 751 (Pa. 1971);

(zzz)   After explaining that a deceased victim's criminal record may be used to corroborate a defendant's alleged knowledge of the victim's violent character to show that the defendant reasonably believed his life was in danger or to prove the victim's allegedly violent propensities to show that the victim was in fact the aggressor, Amos clarifies that a defendant may not introduce all of the convictions in a victim's record, but rather only those of the same nature and not too distant in time, id. at 751-52;

(aaaa)   Clemmons, by reference to Amos, does not change or alter the rules from Dillon or Smith regarding non-convictions and does not support Walker's contentions;

(bbbb) In Williams, the Pennsylvania Supreme Court explained that a weapon shown to have been in a defendant's possession may properly be admitted into evidence, even though it cannot positively be identified as the weapon used in the commission of a particular

crime, if it tends to prove that the defendant had a weapon similar to the one used in the perpetration of the crime, <u>Williams</u>, 640 A.2d at 1260;

(cccc)  But the Pennsylvania Supreme Court in <u>Williams</u> does not stop there, adding that "Any uncertainty that the weapon is the actual weapon used in the crime goes to the weight of the evidence," <u>id.</u> at 1261;

(dddd)  While that portion of <u>Williams</u> can be read broadly to mean that evidence of owning guns is probative of access to guns, Walker's argument is readily distinguishable since Walker argues that a prior arrest for having a gun is probative of a violent character, which is a greater leap and more tenuous inference than the one actually endorsed in <u>Williams</u>;

(eeee)  We conclude after our <u>de novo</u> review that Walker, even if he had known of Ricardo Thomas' criminal history before trial, would not have been permitted to introduce those arrest records because none of the arrests for relevant conduct demonstrating a violent propensity resulted in convictions, and per the rule from <u>Dillon</u> and <u>Smith</u>, violent acts not resulting in convictions cannot be used to demonstrate a deceased victim's violent propensity to support a claim that the victim was the initial aggressor;

(ffff)   Second, we consider whether Pennsylvania has a rule barring the admission of arrest records to show that a deceased victim was the initial aggressor;

(gggg)  As we explained above, notwithstanding Walker's arguments, it does;

(hhhh)  Walker argues that even if Pennsylvania had such a rule -- which again, it does -- it would be unconstitutional, citing to <u>Holmes v. South Carolina</u>, 547 U.S. 319 (2006) and <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986), Objections at 18;

(iiii)    In <u>Holmes</u>, the United States Supreme Court found that a South Carolina rule of evidence precluding a criminal defendant from introducing evidence of a third party's

guilt if the prosecution's evidence was strong enough -- even if, when viewed independently, the evidence of third party guilt would have great probative value -- violated a criminal defendant's right to have a meaningful opportunity to present a complete defense, <u>Holmes</u>, 547 U.S. at 329, 331;

(jjjj)    In <u>Crane</u>, the United States Supreme Court considered whether the exclusion of testimony about the circumstances of a defendant's confession violates a defendant's rights under the Sixth and Fourteenth Amendments, <u>Crane</u>, 476 U.S. at 686;

(kkkk) Explaining that states have the power to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability, the Supreme Court nonetheless held that Kentucky's blanket rule excluding proffered testimony about the circumstances of a defendant's confession deprived him of a fair trial, <u>id.</u> at 690;

(llll)    While both <u>Holmes</u> and <u>Crane</u> discuss what it means for a defendant to have a meaningful opportunity to present a complete defense, neither case suggests that Pennsylvania's evidentiary rules from <u>Dillon</u> and <u>Smith</u> are unconstitutional, and Walker has failed to show that the U.S. Constitution would have required the admission of Thomas' arrest records;

(mmmm)       Third, we consider whether Walker's possession of a loaded handgun when he approached the house where the victim was sleeping would have defeated his self-defense claim;

(oooo) Walker argues that the report and recommendation's reference to <u>Commonwealth v. Camp</u>, 330 A.2d 844 (Pa. 1975) is "inapposite" because Walker "was not carrying a gun 'looking' for Thomas or anyone who threatened him," but rather he testified that he "just always had a gun" for protection, Objections at 19;

(pppp) Walker also argues that the "carrying of a gun does not by itself defeat a claim of self-defense in Pennsylvania," id. at 20;

(qqqq) In Camp, the Pennsylvania Supreme Court considered the defendant's appeal from his second degree murder conviction and concluded that the record revealed the defendant "rather than being free from fault in provoking or continuing the difficulty which resulted in the killing, was directly responsible for its occurrence" because he "went to the bar armed and looking for the persons who threatened him" and that "sort of conduct takes this homicide out of the category of self-defense," Camp, 330 A.2d at 846;

(rrrr)   The Pennsylvania Supreme Court, summarizing the facts underlying Walker's conviction, explained that on the morning before Walker killed Thomas, he went to the McKnight residence and physically assaulted Johnson; repeatedly called the McKnight residence demanding to speak with Johnson and asking if her boyfriend was there; spoke with Thomas, who told Walker to stop harassing Johnson; telephoned Johnson at midnight to tell her he was coming over and threatening her; broke into the house after 3:00 a.m.; fatally shot Thomas; and finally shot Johnson twice in the head, Walker I, 656 A.2d at 94-95;

(ssss)   Walker did not just carry a gun, and these facts are sufficiently analogous to those in Camp to support the contention that Walker's conduct took his killing of Thomas well outside of the category of self-defense;

(tttt)   Fourth and finally, we consider whether Thomas' motive for sleeping at the house where he was killed was relevant to the reliability of the verdict;

(uuuu) Walker contends that his self-defense claim "becomes infinitely more plausible and the verdict concomitantly less reliable" if the facts bear out that Thomas slept at the McKnight residence not to protect Johnson, but because he was a fugitive, Objections at 20;

(vvvv) Walker argues via Washington v. Beard, 2015 WL 234719 (E.D. Pa. Jan. 16, 2015) (Stengel, J.) that Thomas' arrest records had "significant impeachment value" since they cast doubt on the Commonwealth's arguments that Thomas was in the McKnight residence solely out of concern for Johnson, Objections at 21;

(wwww)    In Washington, the Court found that there was a reasonable probability that certain disclosed evidence regarding a description of a shooting would have been undercut by non-disclosed evidence regarding consistent descriptions of a weapon, undermining confidence in the verdict, 2015 WL 234719 at *25;

(xxxx) Unlike in Washington, where the non-disclosed exculpatory evidence bore directly on confidence in the verdict because it undermined the disclosed inculpatory evidence, here the non-disclosed evidence -- Thomas' arrest record -- does not undercut the reliability of the verdict, as it only goes to alternative reasons Thomas might have had for being in the house and does not bolster Walker's argument that he acted in self-defense;

(yyyy) As we conclude, based on our de novo review, that the state court's adjudication of Walker's Due Process claim did not involve an unreasonable application of clearly established federal law, we overrule Walker's objection;

(zzzz)  To summarize our de novo review: Because the state court adjudicated Walker' claims on their merits, we may only grant habeas relief if the state court's adjudication resulted in a decision contrary to, or involved an unreasonable application of, clearly established federal law, or the adjudication resulted in an unreasonable determination of the facts in light of the evidence presented at the state court proceedings, and Walker has not shown that to be the case;

(aaaaa) Walker also requests an evidentiary hearing;

20

(bbbbb)      AEDPA permits hearings on habeas review only in a limited number of circumstances, 28 U.S.C. § 2254(e)(2), none of which are present here;

(ccccc) When AEDPA does not bar an evidentiary hearing, we may nonetheless exercise our discretion to decline to conduct one, Morris v. Beard, 633 F.3d 185, 196 (3d Cir. 2011), and we consider whether such a hearing could enable a petitioner to prove the petition's factual allegations, which, if true, would entitle him to habeas relief, Schriro v. Landrigan, 550 U.S. 465, 474 (2007);

(ddddd)      But where the record refutes a petitioner's factual allegations or otherwise precludes habeas relief, no evidentiary hearing is required, id.;

(eeeee) We agree with the report and recommendation's conclusion that AEDPA does not permit an evidentiary hearing in this case, but that even if it did, no evidentiary hearing is required, as the evidentiary record before the state court, and now this Court, more than suffices to address all of Walker's claims, and there are no factual allegations in his petition which if proven would entitle him to habeas relief;

(fffff)   As we have overruled all of Walker's objections after de novo review and agree that no evidentiary hearing is required, we will adopt the report and recommendation, deny Walker's petition, and decline to conduct an evidentiary hearing; and

(ggggg)      As we have rejected Walker's constitutional claims on their merits and reasonable jurists would not find our assessment of his constitutional claims debatable or wrong, we will decline to issue a certificate of appealability, see Slack v. McDaniel, 529 U.S. 473, 484 (2000) & 28 U.S.C. § 2253(c)(1)(A);

It is hereby ORDERED that:

1.      The report and recommendation (docket entry #59) is APPROVED and

ADOPTED;

2.      Petitioner Shawn T. Walker's amended petition (docket entry #27) is

DENIED without an evidentiary hearing;

3.      We DECLINE to issue a certificate of appealability; and

4.      The Clerk of Court shall CLOSE this case statistically.

BY THE COURT:

/s/ Stewart Dalzell, J.